# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BARBARA CORDELLIA OATIS,** <br> **Plaintiff,** <br> v. <br> **NANCY A. BERRYHILL**, Acting **Commissioner of Social Security,** <br> **Defendant.** | NO. CV 17-971-KS <br><br> **MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

Barbara Cordellia Oatis ("Plaintiff") filed a Complaint on February 7, 2017, seeking review of the denial of her application for supplemental security income ("SSI"). (Dkt. No. 1.) On March 16, 2017, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 11-13.) On October 3, 2017, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No 19.) Plaintiff seeks an order reversing the Commissioner's decision and awarding benefits or, in the alternative, remanding for further proceedings. (Joint Stip. at 18-19.) The Commissioner requests that the ALJ's decision be affirmed or, in the alternative, remanded for further proceedings. (*See Id.* at 19-20.) The Court has taken the matter under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On April 30, 2017, Plaintiff, who was born on December 4, 1962, protectively filed an application for SSI alleging disability commencing April 1, 2013.[1] (*See* Administrative Record ("AR") 219-27.) Plaintiff's past relevant work was as a child monitor, a medium exertion, semi-skilled occupation with an SVP of 3, performed at light (20 CFR 416.964). (AR 45.) After the Commissioner denied Plaintiff's application initially (AR 131-35) and on reconsideration (AR 142-46), Plaintiff requested a hearing. (AR 147-49.) Administrative Law Judge Barbara Dunn ("ALJ") held a hearing on June 9, 2015 and held a supplemental hearing on October 20, 2015. (AR 29-78.) At the initial hearing, Plaintiff and vocational expert ("VE") Nick Corso testified before the ALJ. (AR 31-50.) At the supplemental hearing on October 20, 2015, Plaintiff testified, along with medical expert, Dr. Nancy Intera, and VE Gail Maron. (AR 51-78.) On December 30, 2015, the ALJ issued an unfavorable decision, denying Plaintiff's application for SSI. (*Id.* at 8-28.) On December 28, 2016, the Appeals Council denied Plaintiff's request for review. (*Id.* at 1-3.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ noted at the outset that changed circumstances were established in the record since the April 28, 2010 decision denying Plaintiff's application for SSI, including her change of age category from a "younger individual" to a person "closely approaching advanced age," and evidence of new impairments of severe lumbar and knee osteoarthritis, bipolar disorder, and schizophrenia. (AR 14.) Then, applying the five step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in any substantial gainful activity since her April 30, 2013 application date. (*Id.*) At step two, the ALJ found that Plaintiff had the following severe

---

[1] Plaintiff was 50 years old on the application date and thus was categorized an individual closely approaching advanced age under agency guidelines. *See* 20 C.F.R. § 416.963(d).

2

impairments: severe lumbar and knee osteoarthritis, depression, a bipolar disorder, and schizophrenia. (AR 14-15.) The ALJ concluded, at step three, that Plaintiff did not have an impairment of combination of impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926). (AR 24-26.)

The ALJ also determined that new and material changes had been documented relating to Plaintiff's residual functional capacity ("RFC") assessment since the 2010 decision that warranted additional functional restrictions. (AR 16.) Specifically, the ALJ determined:

> [Plaintiff] has the residual functional capacity to lift, carry, push, or pull 50 pounds occasionally and 25 pounds frequently; she can stand and/or walk 6 hours or sit 6 hours total in an 8 hour workday; she is limited to occasional ladder, rope, and scaffold climbing; she is capable of frequent ramp/stair climbing, balancing, stooping, kneeling, crouching and crawling and she is limited to unskilled work with occasional public, co-worker and supervisory contact.

(AR 16-17.)

At step four, the ALJ concluded that Plaintiff was unable to perform her past relevant work as a child monitor. (AR 20-21.) However, the ALJ determined, based on the testimony of VEs Corso and Maron, that Plaintiff was capable of performing jobs that exist in significant numbers in the national economy, including the representative occupations of "45,000 national medium, SVP 2 laundry worker II positions, 90,000 national medium, SVP 2 warehouse worker positions, and 76,000 national medium, SVP 2 hand packager positions." (AR 22 (citing DOT 361.685-018, 9411.687-058, and 920.587-018).) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in

3

the Social Security Act, from the alleged onset date through the date of the ALJ's decision. (*Id.*)

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (internal citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); *Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not

reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (internal citations omitted).

## DISCUSSION

The parties' Joint Stipulation presents only one disputed issue: Whether the ALJ properly applied the correct legal standard in assessing Plaintiff's RFC. (Joint Stip. at 5.) However, the Court construes the dispute as raising two sub-issues: (1) whether the ALJ properly applied *res judicata* based on the earlier ALJ's non-disability decision of April 28, 2010; and (2) whether the ALJ properly rejected the opinion of Plaintiff's treating physician in reaching the nondisability decision. (*See* Joint Stip. at 4-11.)

**I.** *Res Judicata*

Plaintiff's first contention is that the ALJ erred by relying on a previous SSI ruling as *res judicata* in denying Plaintiff's application for disability benefits in this case. (Joint Stip. at 5.) Specifically, Plaintiff argues that because the ALJ erroneously applied *res judicata*, the ALJ also erred in not finding that Plaintiff qualified for disability benefits based on a listing under step three and in assessing her physical impairments under step four. (Joint Stip. at 6.) In response, Defendant contends that the ALJ's decision is free of legal error because "*res judicata* is not a 'yes/no' binary consideration," and "the ALJ reviewed the record and made specific findings at each step of the sequential evaluation." (Joint Stip. at 11 (citing AR 14-22).)

//
//
//

## A. Applicable Law

"The principles of *res judicata* apply to administrative decisions, although the doctrine is applied less rigidly to administrative proceedings than to judicial proceedings." *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988). "Normally, an ALJ's findings that a claimant is not disabled create [sic] a presumption that the claimant continued to be able to work after that date." *Vasquez v. Astrue*, 572 F.3d 586, 597 (9th Cir. 2009). "The presumption does not apply, however, if there are 'changed circumstances.'" *Lester v. Chater*, 81 F.3d 821, 827 (9th Cir. 1994) (citation omitted); SSR 97-4(9). Examples of changed circumstances include "[a]n increase in the severity of the claimant's impairment," "a change in the claimant's age category," and a new issue raised by the claimant, "such as the existence of an impairment not considered in the previous application." *Lester*, 81 F.3d at 827-28 (citations omitted); *see also* SSR 97-4(9).[2]

In *Chavez v. Bowen*, the Ninth Circuit addressed how *res judicata* applies when a previously denied disability claimant makes a subsequent application for benefits with evidence of changed circumstances. *Chavez v. Bowen*, 844, F.2d 691, 694 (9th Circ. 1988). The court noted that while *res judicata* made binding the first judge's determinations of the claimant's RFC, the claimant's attainment of a different age category status "became legally relevant and should have been considered." *Id*. The second ALJ must "determine whether [the claimant's] current circumstances [are] different from those found by the first ALJ." *Johnson v. Astrue*, 358 F. App'x 791, 792 (9th Cir. 2009). A second ALJ may properly apply *res judicata* when a claimant "has not established changed circumstance sufficient to overcome the presumption of continuing nondisability." *Kilian v. Barnhart*, 226 Fed. Appx. 666, 668 (9th Cir. 2007); *see also* Chavez, 844 F.2d at 694 (even where a change in age status occurred and could be outcome-determinative, finding "[t]he first administrative law

---

[2] The presumption also does not apply "where the claimant was unrepresented by counsel at the time of the prior claim." *Lester*, 81 F.3d at 827-28 (citing *Gregory v. Bowen*, 844 F.2d 664, 666 (9th Cir. 1988)).

judge's findings concerning the claimant's residual functional capacity, education, and work experience are entitled to some res judicata consideration in subsequent proceedings.") Thus, to overcome the presumption, a claimant must present "new and material evidence to the second judge" to support her claim. *Chavez*, 844 F.2d at 694.

When a claimant overcomes the presumption of continuing non-disability, however, a prior ALJ's individual findings are still entitled to some *res judicata* consideration absent new information not presented to the earlier adjudicator. *See* SSR 97-4(9) (if the claimant rebuts the presumption, adjudicators must give effect to certain findings contained in the final decision by an ALJ or the Appeals Council on the prior claim): *see also Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173 (9th Cir. 2008) (discussing holding in *Chavez* that "a previous ALJ's findings concerning residual functional capacity, education, and work experience are entitled to some *res judicata* consideration and such findings cannot be reconsidered by a subsequent judge absent new information not presented to the first judge") (citing *Chavez*, 844 F.2d at 694).

**B. Discussion**

Relying on *Vasquez v. Astrue*, 572 F.3d 586 (9th Cir. 2009), and *Lyle v. Secretary of Health and Human Services*, 700 F.2d 566 (9th Cir. 1983), Plaintiff claims that the introduction of a changed circumstance "require[s] the ALJ to completely disregard principles of *res judicata* and evaluate the case *de novo* because the continuing presumption of nondisability has been defeated." (Joint Stip. at 8.) Plaintiff is incorrect and the cases on which she relies do not support her proposition that a completely *de novo* review was required here. In *Vasquez*, the court found legal error where the ALJ failed to consider any new evidence relating to a new impairment. *Vasquez*, 572 F.3d at 598-99. Here, by contrast, the ALJ specifically noted and considered new evidence relating to Plaintiff's new impairments. (*See, e.g.,* AR 14 ("the record reflects changed circumstances

7

since the prior 2010 decision, which includes evidence of 'severe' lumbar and knew osteoarthritis, a bipolar disorder and schizophrenia, which were not addressed in the prior 2010 decision.") In *Lyle*, the claimant asserted that it was error for the ALJ to give *res judicata* effect to the finding of a first judge, but the court found it unnecessary for the second ALJ to meet his burden *de novo* because the claimant presented no evidence of a change in circumstances and, therefore, the second ALJ properly applied *res judicata* principles to that case. *Lyle*, 700 F.2d at 568. But neither decision holds that the ALJ must conduct an independent *de novo* review of the entire prior decision whenever a change of circumstances occurs.

Here, the ALJ expressly acknowledged and considered all of the evidence relevant to Plaintiff's change of circumstances and afforded the appropriate weight to the previous administrative decision. The ALJ assessed Plaintiff's changed circumstances that were established in the record since the April 28, 2010 decision as follows and specifically noted that the presumption of continuing non-disability had been rebutted:

> Currently the record reflects changed circumstances since the prior 2010 decision, which includes evidence of "severe" lumbar and knee osteoarthritis, a bipolar disorder and schizophrenia, which were not addressed in the prior 2010 decision. Additionally, the claimant's age has changed to the extent that she is now an individual closely approaching advanced age for the purpose of this decision. Given these changes, the presumption of continuing non-disability is rebutted. However, I must now determine whether the findings from the prior decision should be adopted or *whether new and material evidence exists which warrant a change in the prior findings.*

(AR 14 (emphasis added).) At each step, the ALJ undertook that further analysis.

The ALJ noted the impairments cited in the 2010 decision, but also acknowledged "new and material evidence" relating to severe impairments supported by the current medical evidence, including lumbar and knee osteoarthritis, depression, a bipolar disorder and schizophrenia. (AR 14-15.) The ALJ also noted that the current medical evidence failed to establish that Plaintiff's asthma, hypertension, diabetes, obesity, and substance abuse were still severe. (AR 15.) The ALJ pointed to evidence from the current record, noting that Plaintiff's diabetes and hypertension had not resulted in any organ damage and that the symptoms and complications related to her diabetes, hypertension, and asthma would not significantly interfere with sustained work activity. (*Id*.) The ALJ also noted that Plaintiff's obesity was not more than minimally limiting since the April 1, 2013 onset date and Plaintiff "has not been hospitalized or received any emergency treatment of hypertension, asthma, or diabetes related complications or symptoms." (*Id.*)

Plaintiff claims that, with respect to the fourth step, the ALJ erred by finding that there had been no new or material change since the 2010 ALJ decision that "would alter the medium exertional restrictions reflected in the prior decision." (Joint Stip. at 6 (citing AR 20).) In particular, Plaintiff complains that the ALJ erred in finding that "the new impairments and related pain do not warrant additional postural limitations not reflected in the prior decision." (Joint Stip. at 6.) However, the record shows that the ALJ reached her conclusion based on an individualized examination of the new evidence and Plaintiff's medical records *since* the previous decision.

As noted, "the SSA may not make different findings in adjudicating the subsequent disability claim unless there is new and material evidence relating to the claimant's residual functional capacity." Social Security Acquiescence Ruling 97-4(9). At the outset of the step-four analysis, the ALJ stated, "There is no new and material change since the 2010 decision establishing 'severe' impairments, which meet or medically equal listings level severity." (AR 15.) The ALJ considered the musculoskeletal listings, but concluded that there was no

9

"objective medical evidence in the record indicating that [Plaintiff]'s back and knee impairments meet or medically equal any of the listed impairments." (*Id.*) Then, with respect to Plaintiff's mental conditions, the ALJ, relying in part on Dr. Terrand's review of Plaintiff's treatment records, concluded that these records also failed reflect sufficient severity in Plaintiff's mental impairments to establish a listing. (*Id.*) The ALJ gave "great weight to Dr. Tarrant's opinion and [found] it is well-supported by the overall medical evidence and grounded on a full review of the entire documentary medical evidence.") (*Id.*) Thus, the ALJ's analysis at step four was individualized and based on the evidence contained in the current record. On that basis, the ALJ met her burden to properly consider the new and material evidence. *See Chavez*, 844 F.3d at 694.

The ALJ also recounted assessments from August and November of 2013 conducted by State Agency reviewing physicians, which concluded that Plaintiff suffered "moderate mental restrictions related to activities of daily living, social functioning and concentration, persistence or pace." (*Id.* 16.) The ALJ found these opinions to be largely consistent with the overall treatment record and, further, noted that the State Agency physicians gave consideration to Plaintiff's statements and a third-party function report. (*Id.*) Furthermore, the ALJ's RFC assessment reflected the changes in Plaintiff's physical and mental functionality.

The 2010 decision found that Plaintiff had the RFC to perform medium work, as defined in 20 CFR 416.967(b), and that she could "lift and carry up to 50 pounds occasionally and up 25 pounds frequently," she had "the ability to stand and/or walk up to 6 hours and sit up to 6 hours in an eight hour work day with normal breaks," and must avoid "concentrated exposure to fumes, odors, dust, gases, and poor ventilation, and a limitation to simple work." (AR 13 (citing AR 86).) The current RFC, while it still found Plaintiff capable of medium work, also limited Plaintiff to "occasional ladder, rope, and scaffold climbing," but found that she was "capable of frequent ramp/stair climbing, balancing, stooping, kneeling, crouching

and crawling." (AR 17.) In addition, the 2010 RFC made no mention of Plaintiff's ability to interact with others. By contrast, the current RFC determination added a restriction that Plaintiff be limited to "unskilled work with occasional public, co-worker and supervisory contact." (AR 18.)

Plaintiff argues that the ALJ "operated under the premise that the limitation to medium exertion is accurate." (Joint Stip. at 7.) But the record indicates that in making her assessment, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (AR 17.) Indeed, the ALJ "follow[ed] a two-step process," where she determined whether any underlying determinate physical or mental impairments existed, and evaluated the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [Plaintiff's] functioning." (*Id.*) The ALJ also outlined how she evaluated the evidence concerning Plaintiff's physical and mental impairments, including treatment records, Plaintiff's testimony, the statements of her sister and another individual, and the findings of Dr. Igor Hunkoff, who opined that Plaintiff was disabled from a psychiatric perspective. (*See* AR 17-20.) After considering all this evidence, the ALJ determined that the record reflected new and material changes "since the prior 2010 decision warranting *additional* functional restrictions." (AR 16 (emphasis added).) Thus, the record does not suggest that the ALJ reflexively applied *res judicata*, despite Plaintiff's changed circumstances. Indeed, the ALJ applied the correct legal standard in assessing Plaintiff's changed circumstances and provided reasons for her conclusions that are supported by substantial record evidence.

## II. The ALJ's Evaluation Of Plaintiff's Medical Reports

In the related sub-issue, Plaintiff contends that the ALJ should have adopted in full the conclusions of Dr. Paul Gailiunas, Plaintiff's treating physician, who opined that Plaintiff was

11

limited to 10 pounds of lifting. (Joint Stip. at 8-10.) Defendant responds that the ALJ properly discounted Dr. Gailiunas's opinions regarding Plaintiff's physical functional limitations because his opinions were inconsistent with the overall record and Plaintiff's limited and conservative treatment. (Joint Stip. 14-15.) Further, Defendant notes that Dr. Gailiunas recorded few objective findings and Plaintiff's treatment records reflected an "extremely active life" that is inconsistent with Dr. Gailiunas's opinion. Defendant also argues, based on the evidence of Plaintiff's many activities, that Plaintiff "did not prove physical functional limitation that significantly exceeded that found by the previous ALJ." (*See* Joint Stip. at 16.)

**A. The ALJ's Assessment of Plaintiff's Physical Condition**

In a letter dated October 20, 2014, Dr. Paul Gailiunas, Plaintiff's treating physician, stated that Plaintiff, a long-term patient of his, "has multiple medical problems," but "is doing much better and her condition is stable." (AR 441.) He concluded that Plaintiff "should not work at job climbing ladders or lifting objects heavier than 10 pounds." (*Id.*) He opined that Plaintiff "is able to work a full-time job with the above restrictions." (*Id.*) In her review of this letter, the ALJ agreed with Dr. Gailiunas that Plaintiff's physical conditions could limit her ability to climb, noting that her "knee and back conditions would reasonably limit her to occasional ladder, rope, and scaffold climbing and frequent ramp/stair climbing, balancing, stopping, kneeling, crouching, and crawling." (AR 20.) The ALJ, however, found that the record reflected significant and extensive physical functioning that "indicates greater functioning than assessed by Dr. Paul Gailiunas." (*Id.*)

Plaintiff provided progress notes for treatment by Dr. Gailiunas at Chapcare Clinic, from July 31, 2009 to April 6, 2015. (AR 442 -674.) On April 29, 2013, Dr. Gailiunas reported that Plaintiff had "a history of asthma, allergic rhinitis, diabetes, and hypertension, as well as chronic back and knee pain, and headaches, following an M[otor] V[ehicle]

A[ccident] in 1982." (AR 568.) When he last saw Plaintiff, "her chronic pain was fairly well controlled on tramadol and cyclobenzaprine." (*Id.*) Plaintiff also had "chronic skin rash on [her] ankles" and "differential was psoriasis vs lichen planus." (*Id.*) She consistently complained of persistent back and knee pain. (*See, e.g.*, 545, 550.)

In the September 16, 2013, November 4, 2013, and February 19, 2014, progress notes, Dr. Gailiunas indicated that Plaintiff had mild improvements in her peripheral edema, but "poor ROM lumbar spine." (AR 523, 533, 448.) In addition, her knees were swollen and tender. (*Id.*) On July 2, 2014, Plaintiff reported worsening, very severe knee and back pain and received an intramuscular injection of methylprednisolone sodium succinate. (AR 500-02.) The August 14, 2014 progress notes showed that Plaintiff's knees were both swollen and tender and that she was experiencing tenderness over her mid-lower spine and left paraspinal muscles. (AR 491.) Plaintiff's August 22, 2014 progress notes reported the same symptoms. (AR 482.) On January 21, 2015, Plaintiff reported recent vertigo, nausea, sweating, headaches, and complaints of hypertension. (AR 465.)

On February 9, 2015, Plaintiff had a follow up visit for dizziness and hypertension. The notes indicate that she was feeling much better at the time of the visit and stated that Plaintiff now had "a part-time job and [was] feeling more in control." (AR 460.) There were no additional notations in the March 11, 2015 progress notes. (AR 452.) Plaintiff went to the emergency room approximately one week before April 6, 2015 for severe abdominal pain, trouble walking due to pain, vomiting, and asthma. She was sent home after receiving a dose of morphine. (AR 443.)

The ALJ also considered reports of Plaintiff's "significant and extensive physical functioning." (AR 20.) The ALJ noted that during the period of alleged disability, Plaintiff "engage[d] in extensive housing and job searches throughout the period at issue." (AR 18.) The progress notes from a June 20, 2013 session at Portals Mariposa Clubhouse at Pacific

Clinics indicate that Plaintiff had been hired at the Dollar Tree store. (AR 371.) She also stated that she "ha[d] been going really fast" and could "only do so much with the time" that she had. (*Id.*) Plaintiff expressed that she moved so quickly that she would often burn out. (*Id.*) In addition, on May 20, 2013, Plaintiff reported being offered another job at a line factory, but turning it down, stating, "'It only pays pennies, and I'm not willing to work for that.'" (AR 378.) Plaintiff said that she would continue to apply for better jobs that would "'pay her what [she] deserve[d], . . . 30-40 dollars an hour.'" (*Id.*) Plaintiff said, "'I am not going to take just any job.'" (*Id.*) In October 9, 2013, she reported working at both Homeboy Industries and the Dollar Tree while still applying to other jobs, including a position with the MTA. (AR 407.) At the same time, she was still actively looking for housing. (AR 409, 417.)

At the hearing before the ALJ, Plaintiff testified that her time at Homeboy Industries was not really "work", but that for eight months she attended Narcotics Anonymous meetings and anger management classes every day from 8:00 a.m. to 12:00 p.m. (AR 68-70.) She testified that her work caring for an elderly woman lasted about 30 days in 2014 and she stopped because the woman was transferred to other care. (AR 71.) She also testified that she left her position at Dollar Tree because she "couldn't be there on time all the time," and "it was more that I wasn't getting along with some of the other employees, and the layoff because of the budgets or whatever." (AR 72.)

### B. Applicable Law

"The ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015). In doing so, the ALJ must articulate a "substantive basis" for rejecting a medical opinion or crediting one medical opinion over another. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *see also Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir. 2015) ("an ALJ

cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them").

The opinion of a treating source is generally entitled to greater weight than the opinion of doctors who do not treat the claimant because treating sources are "most able to provide a detailed, longitudinal picture" of a claimant's medical impairments and bring a perspective to the medical evidence that cannot be obtained from objective medical findings alone. *See Garrison*, 759 F.3d at 1012; *see also* 20 C.F.R. § 416.927(c)(2). To reject an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence." *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014). If, however, the treating physician's opinion is contradicted by another medical source, the ALJ must consider the factors set out in 20 C.F.R. § 416.927(c)(2)-(6) in determining how much weight to accord it. These factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician, the "[n]ature and extent of the treatment relationship" between the patient and the treating physician, the "[s]upportability" of the physician's opinion with medical evidence, and the consistency of the physician's opinion with the record as a whole. The ALJ must articulate "specific and legitimate reasons that are supported by substantial evidence" to reject the contradicted opinions of a treating physician. *Ghanim*, 763 F.3d at 1161.

An ALJ may properly reject a treating physician's conclusions that do not "mesh" with the treating physician's objective data or history, *see, e.g.*, *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001), and "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) ("discrepancy" between treating physician's assessment and clinical notes is a clear and convincing reason for not relying on the doctor's opinion).

15

**C. Discussion**

The ALJ properly relied on evidence in Plaintiff's medical records to conclude that Plaintiff possessed "greater functioning than assessed by Dr. Paul Gailiunas." (AR 20.) The ALJ acknowledged Plaintiff's frequent complaints of "somewhat persistent back and knee pain," but the ALJ noted that Plaintiff's treatment regimen was relatively conservative and she was able to engage in activities that required significant functional abilities, including attending classes, job hunting and part-time employment. (*Id.*)

In rejecting Dr. Gailiunas's opinion of substantial limitation, the ALJ found Dr. Gailiunas's opinion inconsistent with the fact that the medical records indicated that Plaintiff's condition was well-managed by a conservative treatment plan. Her records consistently reference the same physical conditions: hypertension, pain in her joints and lower leg, degeneration of lumbar or lumbosacral invertebral disk, diabetes, anemia, chronic airway obstruction, and esophageal reflux. (*See, e.g.*, AR 479.) At numerous visits, Plaintiff complained that her knees were swollen and tender and that she was experiencing tenderness over her mid-lower spine and left paraspinal muscles. (*Id.* at 491.) In addition, on January 21, 2015, Plaintiff reported recent vertigo, nausea, sweating, headaches, and hypertension. (*Id.* at 765.)

The record also indicates that Plaintiff managed her symptoms effectively with conservative treatment. On April 29, 2013, Dr. Gailiunas reported that when he last saw Plaintiff one year prior, "her chronic pain was fairly well controlled on tramadol and cyclobenzaprine." (AR 568.) The fact that Dr. Gailiunas had not seen Plaintiff in a year, itself suggests conservative treatment for non-acute symptoms. On February 9, 2015, when Plaintiff visited the doctor for a follow-up visit regarding dizziness and hypertension, she reported feeling much better. (AR 460) In spite of Plaintiff's numerous reports of knee

tenderness (*see id.* at 482, 491, 500-502), Dr. Gailiunas reported that Plaintiff had "normal gait" (AR 467).

The ALJ noted that the Plaintiff's treatment regimen was not consistent with Plaintiff's alleged functional limitations. Plaintiff received a knee injection on July 2, 2014 (*Id.* 500-02.) But, according to Dr. Gailiunas, "her chronic pain was fairly well controlled on tramadol and cyclobenzaprine." (*Id.* at 568.) Based on the treating records, the ALJ concluded that, "aside from a steroid injection to the knee," Plaintiff received "fairly conservative treatment with a lack of aggressive treatment." (AR 20.) The ALJ noted that Plaintiff never received any specialist pain management care, surgery, or orthopedic treatment. *Id.*

The ALJ also discounted Dr. Gailiunas's opinion because, in addition to being inconsistent with Plaintiff's conservative course of treatment, the ALJ found that Dr. Gailiunas's assessment of Plaintiff's limitations conflicted with Plaintiff's own reported level of physical functioning. (AR 460.) The ALJ found that "the treatment record is rife with descriptions of work and other activity during the period of alleged disability." (AR 18.) Plaintiff argues that there is "an absence of any development as to the extent to which [she] performed these activities." (Joint Stip. at 10.)

Nevertheless, the ALJ pointed to ample examples in the record of Plaintiff's ability to function well above the level indicated by Dr. Gailiunas's opinion letter. Plaintiff engaged in extensive job and housing searches, which required her to take the bus throughout Los Angeles. (AR 19, 359.) In fact, her job searches were largely successful. At the hearing, Plaintiff testified that she had worked as a babysitter, a select staffer, a general laborer for the Dollar Tree, a caretaker for an elderly woman, and a cook at a convalescent home. (*Id.* 32-33, 58, 65-67.) At one point, he ALJ noted, "Indeed, recent February 9, 2015 records reflect [Plaintiff]'s report of having a part-time job. (AR 20; *see* AR 460 (Plaintiff reported having "a part-time job and [was] feeling more in control.").) While much of this work was for

limited periods of time, there is no indication in the record that Plaintiff left any of her work situations because of her physical limitations. (*See e.g.,* AR 72.)

On May 20, 2013, at a session at Portals Mariposa Clubhouse at Pacific Clinics, Plaintiff indicated that she had been offered employment at a line factory, but turned it down, stating, "'It only pays pennies, and I'm not willing to work for that.'" (*Id*. at 378.) Plaintiff said that she would continue to apply for better jobs that would "'pay her what [she] deserve[d], . . . 30-40 dollars an hour.'" (*Id.*) Plaintiff said, "I am not going to take just any job." (*Id.*) Plaintiff even worked overnight shifts at the Dollar Tree. (*Id.* 421.)

In sum, the ALJ provided specific and legitimate reasons supported by substantial evidence for giving little weight to Dr. Gailiunas's October 2014 letter, because it was inconsistent with Plaintiff's records as a whole. *See Tommasetti*, 533 F.3d at 1041 (incongruity between treating physician's opinion and the treating records is a specific and legitimate reason for rejecting that physician's opinion); *Thomas*, 278 F.3d at 957 (ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings."). Accordingly, the ALJ did not err in discounting Dr. Gailiunas's opinions and the agency's adverse decision must be affirmed.

## CONCLUSION

For the reasons stated above, the Court finds that the Commissioner's decision is supported by substantial evidence and free from material legal error. Neither reversal of the ALJ's decision nor remand is warranted.

Accordingly, IT IS ORDERED that Judgment shall be entered affirming the decision of the Commissioner of the Social Security Administration.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATE: December 14, 2017

/s/ Karen L. Stevenson
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE